Case number 23-1089 et al. Hecate Energy LLC petitioner versus Federal Energy Regulatory Commission. Mr. Street for the petitioner, Ms. Gow for the response, Ms. Warren for the intervener. Mr. Street, good morning. Good morning and may it please the court. Petitioner Hecate Energy wants to add renewable resources to the electric grid and is willing to pay network upgrade costs in order to participate in PJM's expedited process for interconnection. Everyone agrees that the purpose of the expedited process is to identify projects that can smoothly progress to interconnection without dropping out or clogging up the queue. FERC acted arbitrarily when it approved PJM's $5 million upgrade cost threshold for two reasons. First, FERC lacked substantial evidence for a cost-based cutoff because it relied exclusively on PJM's SESO that even if taken as true would not support. Say that it relies on the SESO, but wasn't this a very lengthy, robust transaction amongst the operators? It certainly was a heavily negotiated queue reform overall, but for the part that is being challenged here, which is the $5 million threshold, the sole basis for FERC's acceptance of that threshold, as opposed to other things, was PJM's statement that in its experience, the $5 million threshold helped to identify projects that were more likely to have complex studies and more likely to drop out of the queue. They gave no evidence of that, and of course they had already access to that evidence. Didn't they say a majority? I'm glad you mentioned that, Your Honor, because I think when you drill down to look at the specifics, factual assertions that underlie PJM's allusion to evidence and experience, they actually are quite revealing. You alluded to the majority, and what they actually said, which is reflected in paragraph 65 of the Commission's order, is that they said a majority of projects with network upgrades over $5 million do not proceed to completion, but that data point is totally unilluminating without knowing what the comparator is, without knowing whether projects with network upgrades under $5 million proceed or fail out at a similar level. So I'm afraid that all they're saying is we have this experience that something is true, but when you look at what they're actually saying, they're not comparing some things above the $5 million to other things below the $5 million, and that's what's necessary to sustain the $5 million cutoff. Can I ask you one other question? Is the expedited process still due to run out in about four months? It is due to complete around January 2025, is my understanding. Yes. And there's no, as far as you, well, unless the Perk Lawyer. Go ahead. Right, and the comparator would be the other process that we're currently in, which is running much longer than that. I had a question about standing, in particular, redressability, and that's just, how can we be confident that Hecate's injury would be redressed if PJM, let's say, resubmitted its proposal and eliminated the expedited process entirely? So it seems like there's a number of things that PJM could do that wouldn't benefit Hecate. So the test is whether a relief from this court would likely alleviate the injury. It doesn't have to be something this court is confident of or likely alleviate, and we think that it's highly likely here because this is just one piece of the overall puzzle, and there's no reason to think, especially now that the expedited process has proceeded to a certain extent, that PJM is just going to throw out the entire expedited process. I mean, that would be totally irrational. I think this court would vacate in part, just like it did in the $5 million threshold. PJM is not going to throw out their whole Q reform. It's not going to throw out its whole expedited process. It's going to have discretion to craft some way to let Hecate into the expedited process, and then it will fix the problem that this court will have identified. But in NRG, isn't it also this court's jurisprudence that you're not supposed to modify the proposal that's being presented to us, that that's not our job? Yes, this court is not in the business of directing any particular outcome, but what it would say is that the $5 million threshold is unduly discriminatory, is arbitrary and capricious. It would be up to the commission and PJM to fix that problem in whichever way they want. Of course, the most rational and direct way of doing that would be to just eliminate that threshold and to let Hecate or others in that can progress through the queue. In our case, we're willing to put up the total amount of the network upgrade costs that are assigned to us, which is the main reason that projects drop out of the queue is because companies get assigned some massive amount of network upgrade costs to say, we don't want to pay that, we're going to drop out of our spot in the queue. Or we're going to haggle over who gets assigned what percentage of the network upgrade costs with all the other participants. You seem confident that the I understand that your earlier comments were suggesting that we shouldn't be concerned about that particularly, but I'm trying to make the point that if you send it back, we don't have the ability to make them only carve that out. Wouldn't it kind of go back to the drawing board and have an opportunity for stakeholders to reconvene, etc? So, I'm not sure this is all that different than most FERC petitions for review where particular aspects are challenged. And when this court vacates a particular aspect of a FERC order, I mean, yeah, theoretically, the agency could go back to the drawing board and throw everything out. But typically, what it does is fixes the problem that this court identifies. And where the stakeholder process is completely done, where we're already a little ways into the expedited process, it's inconceivable to me. I mean, you can ask PJM, but it's inconceivable to me, they're just going to throw out the entire expedited process and start over rather than just fix the particular problem with it that this court identified. But the expedited process is about to run out, right? Well, it is. It is underway, and that's their current projection that it will finish then. And the alternate in which Hecate is currently participating as a order will not finish until 2026. So, we think if there is a vacature and remand or a remand, the commission and PJM can fix that problem and can craft some way to put Hecate into an expedited process that will make it better off than it would have been if it were just in the slower transition process. Do you have any data points or anything that projects that are in the transition cycle one absorb higher network costs than those that are in the expedited process? I don't think... Focusing us on that $5 million cap? Well, they do just because that's the PJM threshold. And PJM has said if you're over $5 million, you go into the transition cycle. And our point is that's not a rational way to divide which projects go into the expedited process and which go into the transition cycle. And if you think about it, that's because if you have a project that's assigned $2 million in network upgrade costs, but there's questions about the financing or there's going to be haggling among a lot of parties over who's going to cover that $2 million, that's going to be slow to progress. And that's going to require a lot of negotiations and haggling that could cause the project to drop out completely. But if you've got something that's at $6 million or $8 million, but the financing is confirmed and you've got a sponsor of the project who's willing to say, I'll pay the whole check for the network upgrade costs, well, that's going to progress through the process quickly. There's not going to be a need for negotiation. And that's exactly the kind of project that should be in the expedited process. And I think the key point here is we've talked about the lack of substantial evidence, the lack of verifiable data, the fact that their data points don't even support a comparison above and below the $5 million. But I think FERC's decision not to address or evaluate at all the alternatives that were proposed is also fatal. Because if you think about it, this is an undue discrimination case. And the best way to determine whether something unduly or one key way to determine whether something unduly discriminates is whether there's another alternative that's readily available that's less discriminatory, but also satisfies the regulatory objectives. And I think I would especially direct this court's attention to its consolidated Edison opinion in 2022. I think this case is similar to that. And that was a case where the commission accepted PJM's proposal for allocating network upgrade costs among utilities that were using a new upgraded facility. And the court didn't just look at PJM's test in a vacuum. It didn't say, well, yeah, on their face, these parties are differently situated. Instead, the court compared PJM's test to a readily available alternative that more fairly allocated the costs based on the relative use of the new facilities. And so at page 283 in the opinion, the court faulted the commission for giving, quote, justifications for a threshold keyed to the relative size of the rather than to the relative use of the facility. So the court's comparing PJM's test to an alternative that more closely tracks the regulatory goals. And if you apply that approach here, I think even if you were to think in a vacuum, the $5 million threshold sort of roughly tracked which projects are most likely to progress through the queue. We don't know if it's unduly discriminatory until we look at whether there's an alternative. And Hecate's minor tweak to that $5 million cap would more accurately identify projects that would get through the interconnection process. Can you just articulate for us what you envision would be the minor tweak? What would be the rule that the distinguishing line that they would draw? Yes. Hecate's proposal was if a project is assigned above $5 million in network upgrade costs, then it could enter the expedited process so long as the sponsor of the project, Hecate in this case, is willing to put up the $5 million or more itself to guarantee that it would pay that amount rather than squabble over how the costs are allocated. And that would guarantee, number one, it would guarantee that the project has financing, which is a major reason. More than $5 million. Correct. Correct. Yes. The whole cost. It would put up the whole cost that was assigned to it, which in this case is everything above $5 million or above, whatever that amount would be. So that clears up the financing problem, which causes a lot of projects to drop out of the queue because they've got their finance. Pay-to-pay scheme, because it wasn't just that. It was also that the $5 million or less projects are supposedly less complicated and will require less study. Yes. So I think there's one major problem. There's two major problems with that. Number one is the substantial evidence point, which is just PJM is just telling us that they have no data to back that up. And that's in the face of industry commenters who said, no, that's just not the case. The amount of network upgrade costs does not determine how complicated the studies are, because if you've got one party that's willing to foot the bill, there's not going to be a lot of complicated studies about who gets allocated what. I think the second problem with that is that we have alternatives that keep the $5 million cap. So even if you think the $5 million cap has some value in weeding out more complicated projects, then we've got the cure for that, that we presented to FERC, which is if it's over $5 million and you've got a company willing to foot all of those costs, that makes those just as likely, if not more likely, than the ones below $5 million to get quickly through the process. What do we do with that over 80% of the stakeholders approved this project? Only 30% favored the rule that you're proposing. Well, I think this court reviews the commission's order and the commission's reasoning. I'm not aware, and I don't think my friends have cited any case where the court sort of applies a, you know, it doesn't have to be, it can be a or it can be a little more discriminatory. I just don't think that's practically the way this court reviews rulemaking. FERC's sworn statements and PJM's experience balance together and stakeholders. So, Your Honor, I'm not at all disputing that PJM's experience could have value. Of course it could. If it had come in and said, look, we've got all of this data that tells us how quickly projects progress through the queue and when they drop out. And here's the ones above $5 million, you know, there's 50 and 30 of them dropped out. Here's the ones below $5 million, you know, 40 out of 50 made it through. We'd have a much harder case. I'd be having a much harder time making this argument. But they didn't do that. They just said, in our experience, this. And then when they came down to give actual data, as Judge Henderson pointed out, all they said was a majority of projects above $5 million drop out. But they didn't tell us whether a majority or minority or whatever the percentage is of projects below $5 million drop out. So that doesn't tell us anything about whether that's a good dividing line. I do want to ask one thing, and I'm not minimizing your position, but if the expedited process is due to expire in January of 2025, and you've said, I think, that if you're not in the expedited process, it'll be 2026, are we just talking about a year's delay? I know that can mean a lot, but is that what we're basically talking about? Well, I think you're right to say that can mean a lot, and that's certainly enough to show redressability and standing. I would say we're talking about at least that amount, and I think it's important to remember that PJM has under-projected things many times in the past to say the least with respect to the timelines, and so right now they're telling us those dates. I'm not impugning that or doubting that. I'm just saying that's what they're currently telling us, and we would much rather be in the expedited process that does look more firmly like it's set for a particular end date. This whole transition period ends when? 2027? Well, I don't know. I think they're saying the transition cycle number one. I'm going outside the record, okay? I'll ask it. Yeah, I mean, I think in the rehearing order, FERC said the transition cycle number one was set to conclude in early 2026. And then just the Honeywell case that does allow the agency to rely on representations for those uniquely qualified to provide that information. Do you have anything to say against that? Nothing to say against it. Certainly a precedent of this court, but I think the difference there is what they said were facts that could be verified and tested, and here we don't have access to all the data that PJM has. The commission is well known for requesting data to be able to evaluate the assertions of a utility, but it didn't do that here. It could have asked PJM for that data about projects above $5 million and below $5 million in order to test it. And then I think Judge Childs, the most revealing part to me is what I was mentioning to Judge Henderson. When you look at the specifics of what they think illustrates their experience, it's this a majority above $5 million dropout. The other thing that PJM mentions, I think they mentioned it in their proposal. I'm not sure the commission relied on it, but they also relied on the fact that of the total amount of projects, only 10% are assigned network upgrades over $5 million. But that just tells us that projects with that type of network upgrades are rare. It doesn't tell us how many of those proceed to completion vis-a-vis how many projects with network upgrades under $5 million proceed to completion. All right, we'll give you a couple minutes to reply. Thank you. May it please the court, Angela Gao for the commission. I wanted to start where we left off with redressability. FERC, as your honors mentioned, would necessarily have to reject the proposal in its entirety on remand. And it's completely speculative that Hecate would get the ultimate relief that it wants. It hypothesizes that once FERC rejects the proposal, PJM will submit a new 205 proposal. But even assuming that PJM does, as Judge Childs mentioned, who knows what that proposal would look like. It could entirely eliminate the expedited process. It could use a different threshold that still somehow excludes Hecate's project, or it could narrow the expedited process as well. The point is, all of this is simply guesswork, and that's not enough for redressability. Hecate has to show that it's likely, rather than just merely speculative, that its injuries will be redressed. What about Mr. Street's concern that it's one thing to rely on PJM's expertise, another thing to rely on PJM's expertise when it gives only one side of a comparison? Bigger projects drop out. Do we know the rate of dropping out of below 5 million projects? And if not, does that concern FERC? And if not, why not? Well, I'd want to point out first that the $5 million threshold has a proven track record. It was historically used since 2008 for a very similar purpose as it's used here, which is to identify network upgrades that have significant costs and have more complicated cost allocation issues and would take a longer time to process. So PJM's statements, they're actually empirical observations based on their 30-plus years of experience in processing these interconnection requests. They're also not just theoretical. They are observations that PJM has made that projects with below-cap upgrades are fairly straightforward and simple to process, whereas projects with above-cap upgrades are more complex and time-consuming. And with regard to the point that there needs to be a comparative value to balance statements against, I think that goes more towards Hecate's point that the commission didn't address certain alternatives in its analysis, and that's unnecessary in a Section 205 proceeding. In Section 205, FERC is required to limit its inquiry to the confined proposal at hand, and it's not allowed to move on to alternatives that PJM itself didn't propose. Can you explain what the logic is of saying that more complex and likely to drop out projects or proposals would benefit from the cluster-based approach, whereas simpler projects that are more likely to proceed wouldn't? Just a little bit more sort of just concrete understanding of the cluster-based approach and why it's particularly appropriate to the larger project. Sure. Above-cap projects, they have costlier network upgrades and therefore more significant impacts on the grid. These projects have complex studies and cost allocation issues. You can for sharing the costs of that project, and the task of dividing up who pays how much is one that's often hotly debated and more time-consuming to get through. Also, these projects just inherently take more time to process due to the cost allocation issues, as well as the more studies that they require. Because of these costly network upgrades, they're also at higher risk of withdrawing from the queue and triggering the need for restudies. All of that seems to sidestep Hecate's position, which is there's no study about who pays if we're going to pay for the whole thing. What is missing there? I take it that the ISO system doesn't just exempt from planning transmission upgrade projects that would be fully paid, or does it? If it does, does that mean that there's never any cost passed on? It's just a little hard to appreciate, given what Hecate's arguing about its willingness to carry the cost, if the complexity that you're proposing to cover its share of the cost of a network upgrade that's over $5 million. But that doesn't guarantee that other projects that are also responsible for the same network upgrade are going to fork over the money. The longer that process draws out over who is responsible for paying what, that just contributes to the delay in already existing backlog in PGM's interconnection system. So this is why projects that are simpler, easier to process, or what you could consider as clean projects, they have minimal impact on the grid, very little if any network upgrades required, and can be studied and completed very quickly. That's why they're more suited for the exedited process, which still uses the legacy rules serial cost allocation procedures. Those are procedures in which, if a project decides to withdraw because it feels that the costs are too high, that would be extremely disruptive and trigger iterative restudies for the remaining projects in the queue. Now, for projects that are more complicated, above $5 million, it makes sense that they're being allocated to this cluster-based system, because it's been improved to withstand a lot of the drawbacks under the legacy rules. It discourages late-stage withdrawals and also minimizes the disruption to the remaining projects. By setting all the projects together, it makes the process much more efficient. So it's reasonable that the threshold pairs inefficient serial rules with below-cap projects that are low-risk with simple cost allocations, while also pairing the improved cluster-based rules in transition cycle one with the above-cap projects that are more complex and have a higher risk of withdrawal. So if you've got data that's showing that less than 10 percent of your projects with the network upgrade costs are exceeding the $5 million lead to project completion, is your concern more about the queue or achieving a higher rate of interconnection reform is to get more generators on the market, which means more completed interconnection projects. But the goals of this specific reform filing by PGM is to deal with the incredible backlog that it has in its interconnection queue right now. And that has to balance two competing goals. The first is to transition as quickly as possible to this efficient cluster-based system and procedures. And the second is the need to respect the priority to the extent possible of older projects that are already in the existing queue. So the expedited process, by identifying projects that PGM believes, based on their 30-plus years of experience, are clean, easy, fast to process, it can get through the backlog quicker and move towards that transition faster. Can you help me understand, in this case, whether there's a meaningful difference between the factors and analysis that goes to unduly discriminatory and the factors analysis that go to just and reasonable? It sort of seems like maybe it's all one and the same as applied here. So I believe there's substantial overlap. I can't say for a certain matter whether they are completely coextensive, but it's true that, you know, under Section 205 in the just and reasonable standard, FERC only needs to find that the proposal fits within a zone of reasonableness. And that means that the proposal doesn't have to be the least discriminatory option. It doesn't have to be less discriminatory than what HECUTI's proposing or other alternatives. It just has to be not unduly discriminatory within that zone of reasonableness. And that's exactly why, as the Commission explained, it didn't need to proceed to continue evaluating alternatives after it had already found that PGM's proposal was just and reasonable under Section 205. So if there's a valid reason for treating projects below and above the $5 million threshold differently, does that, in your view of the law, that would resolve just and reasonable, but wouldn't it also resolve unduly discriminatory? Yes. Yes. I believe that's correct. The threshold is only unduly discriminatory if it treats, you know, similarly situated projects differently for no discernible reason. But here there is a discernible reason, and as more of a fundamental matter, these projects are not similarly situated. As we've discussed, projects above and below the threshold are vastly different in terms of how quickly and easily PGM can get through them in the interconnection queue. I'll also mention the examples and hypotheticals that HECUTI has come up with in its brief. That's just the natural consequence of having a cutoff. There's no perfect administrative line drawing, no perfect classifications. And that's okay under Section 205 because, once again, FERC doesn't need to approve the least discriminatory option or one that's less discriminatory than other alternatives, so long as what it has approved is not unduly discriminatory and is within the zone of reasonableness. And I think cities of Bethany— Just to help me out, can you give an example of a case in which something is just and reasonable, but nonetheless unduly discriminatory? I'm just trying to— I actually do not know of a case. I believe that there is significant overlap. I don't know if I can say for certain that they're completely coextensive, but I believe that if the proposal is just and reasonable, then I can't think of a case where it was somehow unduly discriminatory. All right. I do want to ask you one question. Do you anticipate making your target date of January 2025 on the expedited process? I believe that PGM is on track to meet that target date. And I'm glad that you brought that up because it comes back to the point that, at this stage, we can't turn back time. The expedited process has already been ongoing for several months and is, by PGM's latest updates that have been filed in the FERC docket and also posted publicly on its website, on track to be finished by at the latest January 2025. Most projects in the expedited process are actually in the last stage, which is negotiating their interconnection service agreements. So because the expedited process will soon be over, it's unclear how HECADES would achieve its ultimate relief of entering its project into that process when it will no longer exist in a few months. And quickly to the transition cycle matters, do they absorb higher cost by being studied in the cluster versus the serial allocation? So I don't think we can say that. This cost allocations are different, but I don't know that the methods are different, but I don't know, you know, how that impacts the resulting costs. And perhaps PGM can speak more to that. But I will also say the alleged or the injury that HECADES alleged is not any difference in cost allocation methods. It's the delay that they say that their project is suffering, which, you know, absent these reforms that led to the $5 million threshold, and its project would most likely be even worse off in the queue. So the fact that HECADES hasn't, you know, sought to expedite, you know, this, its appeal in any way is telling. I also want to return to the substantial evidence point. This court has previously rejected arguments that FERC's determination is unsupported simply because it lacks what some may call actual evidence. And that's in, for example, Excel Energy, where this court explained that it's perfectly legitimate for FERC to rely on generic factual predictions and base its findings on basic economic theory. In that case, FERC was not obligated to show actual evidence to support its determination when it was simply making the kind of reasonable prediction about the market it regulates to which courts ordinarily defer. And here, that's reinforced by the fact that the $5 million is, again, as mentioned, a historical metric that PGM has used to successfully identify projects that are more complicated and time-consuming. And it demonstrates to the Commission that this used in this context of PGM's latest reforms would also most likely be effective for that purpose while being just reasonable and not unduly discriminatory. And finally, I'd like to return to a point that Judge Childs had raised about the lengthy stakeholder process. It's completely correct that this package of reforms was carefully constructed through a very extensive stakeholder process in which stakeholders were shown, you know, different alternative proposals, and it was the $5 million threshold that won overwhelming stakeholder support. It was a very carefully negotiated key component of the proposal. HECD is essentially trying to do an end run around this process in direct opposition to the goals of interconnection reform in Order 2003 and also the 2008 interconnection order. In both of those orders, the Commission emphasized that independent operators like PGM need to be given flexibility to shape their interconnection procedures in the ways that best address their regional needs. And instead of imposing any general rules or procedures that all operators had to follow, it wanted operators to engage in the stakeholder process and work with its constituents to find the best possible solution. I had just one question of, frankly, something that confused me, and your expertise might help me walk it through. In the Commission's explanation of its denial of HECD's request, and I'm looking at JA 605, it's paragraph 30, the Commission says that the $5 million threshold is not discriminatory because removing requests that cause a relatively low level of network upgrades, quote, should marginally improve the processing of the remaining transition interconnection customers by reducing the total number of interconnect requests in the transition serial and cluster studies, thus marginally reducing both their complexity and the total number of entities that might withdraw during the transition process and trigger the need for restudy. So this is saying you take out the simpler request and process them first. That's going to speed up the processing of more complex requests. And why does that speed them up? It seems clear that it would speed up the processing of the simpler request, but then is it also the cluster studies is the efficiency? So it speeds them up in two ways. First, by getting, you know, rid of the easier projects and finishing them quickly. And first, that in turn improves the processing of the remaining projects by reducing the total number of projects that still are left in the backlog. And by putting them later, go ahead. You have a separate queue for them. Go ahead. In a separate queue, but still fewer number of projects in that queue reduces the complexity because there's fewer project project interactions, fewer cost allocation disputes. And second, it reduces, you know, the likelihood of withdrawal and restudy for the projects that remain when you make the process simpler and limit the number of projects that remain to be studied. Isn't that because, or at least first reasoning that's because of the cluster approach, the additional cluster approach for the more complex programs? It's partially based on the cluster-based rules that do make processing these projects more efficient and can resolve some of the concerns. But it's also by virtue of just narrowing down the projects that are left. So the passion says that removing the request and putting them in the expedited queue will reduce the total number of interconnection requests in the transition serial and cluster studies. The transition serial is the expedited process and the cluster studies are, so, one and two both use the cluster base. That's correct. So the transition serial is the expedited queue. Yes, that's correct. And I think there, the commission's actually referring to a comparison to, you know, a situation in which PGM could have just omitted having an expedited process altogether. And then you can imagine the groups for each transition cluster would have included a greater number of projects within them, increasing their complexity and increasing the risk of withdrawal and restudy. So really the 5 million threshold is sorting, where do we apply cluster-based and where do we not? I believe, yes. From the projects that were in older queue windows, it's just trying to determine which projects are faster and easier to process using a serial process versus those that are more complicated and should be reserved for using the cluster process. Great. That's helpful. Thank you. Thank you. Ms. Warren. Good morning. Wendy Warren for PGM Interconnection LLC. May it please the court, I'd like to start right where Judge Pillard left off because you hit it on the head. The entire point of the expedited process. So, let me back up. Recall that this is all about moving from serial process, which means we study one project, then we move to the next project, then we move to the next project. We study them in a serial fashion. We allocate the costs in a serial fashion. And that was very slow. The proposal was to move to the cluster-based. And there's two things about clusters. You do one study. If you've got 300 projects, you do one study. Well, you do it three times, but you do one study. Tell us just a little more. Okay. What is being studied and how can you get away with one study? How does that compare with what happened in the past? So, the first step is you build a model of all the transmission lines that are already there. Be even a little more general than that. Studying... You're studying in the first round is system impact, which is this generator. If I interconnect it here, and I'm not an electrical engineer, so I'll be really simple. If I plug this generator in... Luckily, I am. Oh, good. Maybe you can explain it. So, if you plug it in here, what reinforcements do I need to make around it? Do I need to upgrade, make this line carry more power? Do I need to put another circuit breaker here? So, that's what we're talking about when we talk about network upgrades, is the reinforcements that we need to make to plug that generator in. So, you build your model of everything. And then, in the serial study, you start with load flow. What does that generator plugging in there... And you build the whole model, but you look at just that generator. What does their project do to the flows of electricity on the system? And how much is it going to cost? Or what's the impact? What do we need to build? The second round of the system impact study... This is now in the current process, but it was true in the old one. You start looking at really more detailed things like short circuit and stability of the system. And you don't necessarily have to study that for every project because some projects don't cause those problems. The last study is a facility study, which is where the transmission owner that they're plugging into tells them how much it's going to cost exactly. I mean, everything before is just kind of an estimate. Now, we're getting down to dollars and cents and specific equipment. You're talking about how much the upgrade will cost. How much the upgrade will cost. And so, when PJM was talking about... We're meeting with the stakeholders talking about, we're going to go from this really slow, inefficient serial process to this new process where we put everybody together. We do that load flow study one time. We have a model with everybody in it, and we run it once. So, how do you cluster? That seems like that becomes the really key thing. You cluster by time. You open an application window. You say, we will be taking applications. Right now, PJM is taking applications for transition cycle number two. And that window ends in December. And then we will know how many projects are in transition cycle number two. So, it's not... I mean, it's geographic to the extent that PJM is geographic. Right. It's just all the things that are on the table as possibly going to be done. Let's look at them all together. Right. And figure out if we were to do them all, how they interact. How they interact. What they require. What we need to do to reinforce the system. But here's the second part about clustering. You, instead of assigning the cost of... Instead of saying project one, your network upgrade costs are $4 million. Project two, your network upgrade costs are $3 million. You just lump it all together. You studied everyone together, and you say the cost of the upgrades for this 300 projects is going to be $5 billion. And they each take a share of that. So, you eliminate a lot of the things Mr. Street was talking about. The haggling. The projects dropping out because their costs are too high. Okay. But now... In that sense, it recognizes that there's not one simple cause. That things are interactive. And therefore, if you're doing this serial, you're losing all kinds of things. You're losing efficiencies. You're also losing externalities that each proposal... That may be associated with each proposal. So, when you put them all together and kind of look at it all and say, if we were to do all of this, what would be the cost and how would it be fair to allocate them? Right. But so now, imagine you're a stakeholder. You're meeting with PJM and your fellow stakeholders. And you have a project that has been under study for two or three years. And you know what your network upgrades cost. And they're low. You're only responsible for a million dollars in network upgrade costs. And so, you say, I don't want to go into that transition process. I don't want to go to the new process because I'm going to have to pick up a share of everybody else's costs. I like what I'm hearing right now. I want this... I like serial for this project. And so, this was the goal of the expedited process was there were projects out there. They'd already been studied. They knew they were below... We knew the network upgrades were below $5 million. So, they were simple. We could do it quickly because they'd already been studied. And it was more a matter of cleaning out. You know, we're going... We've got a backlog of... And I think it was at least 1500 projects. We had a backlog. What can we get out quickly? And are those... They're almost done. They're getting close. They're almost done. And they'll be done by December. So, here's my question. When Hecate says, look, we'll pay our portion, I'm imagining, well, maybe that creates distortions if you imagine that as compared to the cluster system where the cluster system is saying, well, you know, maybe what you're being asked to pay for is a different actual physical infrastructural solution than what would be chosen as a result of a cluster study for all the interconnections. Is that part of the issue or not really? That may be part. I can't speculate as to what Hecate's interest is exactly. I'm thinking more of what's PJM's interest. PJM's. Well, if, you know, why wouldn't you have 5 million threshold asterisk unless you're willing to just be assessed and pay whatever we ask you? So, the goal of the 5 million was to identify projects that were almost done and could be done quickly. Quickly. That was the key metric or that was a key metric. The asterisk will pay, I was interested to hear Petitioner talk about the worry was dropping out. That was not the worry. The worry was these projects are almost done. They're not dropping out. They have low network upgrade costs. They want to get this done. And they want to get it done quickly. And so, let's get them, it wasn't even, yes, it was getting projects out of the transition cycle clusters, but it was really, they're almost done. Let's get them, clean up, get them done, and then we can move on to the transition cycle. And by the way, and this, I think, is really critical. Some of the questions you were asking and the answers were not correct. If the court were to decide that this $5 million threshold is unjust and unreasonable, unduly discriminatory, if it goes back to FERC, if FERC, well, one possibility is we have to start all over. And it's not guaranteed that at that point, PJM would do an expedited process because, well, we'll get into that in a minute, but it's not guaranteed that we would do it because at this point, we're three years on. And almost done with the, I mean, that's going to phase out and everything's going to be by clusters? Yes. This is the last serial cluster. And it was the last serial cluster because the people in it liked it. Our last serial queue. Thank you. Queue, sorry. But, oh no, but that's critical because the only thing that was serial, is serial about it is the cost allocation. They are only paying their own costs. They're not spreading it across the cluster. They're being, they were studied as a cluster. That took place last year or early this year. It started, the expedited process started July of 2023. And at that point, there was a single study. If, as Mr. Street said, we just put, let's just put Hecate and a couple of their friends back in. We'd have to go back and redo the entire expedited process study. People who currently have, either they've currently finished all their studies, they're only waiting for one study, or they might even have an interconnection agreement that's on file with the commission. We'd have to throw that all out. Let's start over again. And what that would do would be to delay the expedited process, certainly, which would push back TC1, which would push back TC2, which would push back the eventual arrival at the new process, which is all we really wanted to get to in the first place. I have a kind of unrelated question, which is the relationship between stakeholder support and PJM's authorities. Did PJM submit to FERC proposed reforms that are approved by only a third of its stakeholders? I don't think it can. I don't think I've seen that. Well, the board of PJM can decide to file something, even if that was not the option chosen by the stakeholders. And what limits that? What controls PJM's? It depends what area of the tariff we're talking about. If it's, for example, transmission rates, that implicates certain rights of the owners of the transmission assets to file changes to those. PJM can't change that. If it's interconnection planning, and that's within PJM's two or five authority. PJM has more autonomy there. Just quickly, with respect to the transition one cycle and the transition two cycle, if a generator drops out, explain that process of how the costs are observed at that time. So, transition cycle one and two are, they're done by, and all the future under the new rules, it's three phases. And, for example, transition cycle one just finished, just passed through phase one, which was they did a system impact study that looked at all the load flows for the Do you want to move forward? If you want to move forward, put, you know, you need to give us some technical specifications on your equipment. You need to put down a certain study deposit. You need to put down kind of earnest money. They're called readiness payments. What I'm really trying to get at is will HECA T absorb costs for the generators that drop out? Everybody who stays in the cluster could absorb costs, but the readiness payments that I had just started mentioning, those protect the people who stay in against the people who withdraw. So, as you move through the phases, you have to put up more and more money, more earnest money, more skin in the game. The later you drop out, the more money you leave in the pot to help build all the things for the entire group. This is under the new system. That's under the new system and the two transition cycles. In terms of addressability, I thought you might have said that you had two points of what would happen if this were remanded to the commission. I'm not sure you got to. So, well, the other one was that, and I slipped it in, but the real problem here is we can't just put HECA T back in and finish up. We've got, you know, 300 projects that are almost done. If we add HECA T in, everybody has to go back to the beginning. All right. Thank you. Thank you. All right. Mr. Street, why don't you take two minutes? Thank you, Your Honor. There's a lot to respond to there. With the court's indulgence, I'll try to briefly hit four points. First, a FERC trying to articulate a basis for the $5 million threshold says that there was a track record for that threshold, and they asserted that it was previously used to identify more complicated projects. That is not in the orders at all, and that's not accurate. The $5 million threshold was used to determine whether the costs could be allocated across different queue windows under the old process. It had nothing to do with whether the projects were more likely to be complicated, more likely to proceed to completion, or more likely to clog up the queue. So they're really arguing, well, we used $5 million for apples over here, so therefore it makes a lot of sense to use $5 million for oranges over here. The commission also argued that the $5 million threshold identified projects that would have more complicated cost allocations, but I didn't hear a persuasive answer for why, if a company is willing to pay all of the network upgrades that are assigned to it, that doesn't solve those complicated cost allocation problems. And the real key, I guess, is FERC didn't address Hecate's argument in that respect in its order. It's made attorney argument this morning about why Hecate's proposal to pay all of the cost allocations somehow doesn't solve the complicated cost allocation problems, but that's not in the order, and that's why the commission has to grapple with alternatives to determine whether something is unduly discriminatory. So let me turn to that and some of Judge Pillard's questions about how discriminatory can something be, how much is the overlap with just and reasonableness. The commission is citing, and PJM is citing cases in its brief that say in just and reasonable cases, the commission cannot select some other alternative, but our point is that in an undue discrimination case, you don't know whether something is unduly discriminatory unless you compare it to the available alternatives. You won't find a case that says in an undue discrimination case, the commission doesn't have to look at alternatives. They would have cited that. It would have been on page one of their brief. In fact, what we have relied on to this court is the consolidated Edison case, pages 282 to 283. I come back to that again because that that was an undue discrimination case. The court didn't just say something was just or reasonable. It looked at whether the dividing line or the test closely tracked the objectives. When the court found that there was some alternative that directly tracked the regulatory objectives, it vacated the commission for failing to look at that. I think the key with undue discrimination is, is it pointless discrimination? Is there something else out there that's readily available that the commission could look at? At a bare minimum, I would say even if the failure to look at alternatives doesn't substantively undermine, you know, directly require vacature of the $5 million threshold, at least administrative law 101 is the commission has to respond to major comments and major objections to their approach. And they say in the background of their order, Hecate and the other commenters made these proposals. And then when they get to the reasoning of their order, they don't say anything about them. So I think we're exactly in the situation that we were in, in the California Public Utilities Commission case from 2021 that I believe Judge Henderson authored, where you have no substantial evidence for the central test that the commission used. You've got commenters pointing out, hey, there's these other options. There's no evidence. And the commission is just silent in the face of that objection. Finally, I want to turn back to a remedy. I think the argument that the commission would have to throw everything out that it approved, it would just have to completely vacate everything is just completely contrary to consolidated Edison. That was again involving network upgrade costs. There were six or seven challenges. The court accepted two or three of them, and it vacated only as to those two or three unduly discriminatory tests. And there's no reason to think the commission therefore is going to throw out the entire order. Now, turning to PJM's argument that, oh, maybe they will throw out the entire expedited process. There's no way they can make an accommodation for Hecate. I guess the number one thing I would have to say to that is that's attorney argument this morning. That's not even in their brief. I mean, PJM didn't even argue lack of redressability. The commission did, but it didn't argue about this impossibility of giving Hecate relief. It was more about having to go back to the stakeholders. So I think that based on the record that the court has, there is going to be a period of time where Hecate could be accommodated. And at the very least, Hecate is entitled to a remand or remand with vacature for the commission to do its job. This is Hecate in a class of one. I mean, if PJM were to propose a rule, supplemental rule, it sounds like you're asking for that would say, oh, you know, the serial treatment transition rule should also apply to self-funding projects. And maybe there's some other way to define largeness or complexity other than cost. I don't know. But if they just were to say self-funding projects should also be in a serial treatment, and then would there be a cluster study with respect to them? Would only Hecate be in that category because nobody else objected? So my understanding, first of all, is that that would be up to PJM to craft that in the first instance. But I'm just thinking, what are you envisioning? Sure. Is it permissible? So I guess there's two questions embedded there. One is Hecate a class of one. I'm not sure about that. I mean, that's the only one that I'm aware of, which I think goes to the argument that, you know, this is somehow going to bring in a huge new class of projects that's going to slow down the queue. I mean, I think to the extent there's only one that we know about that's come forward, I think that does undermine that point. But I think my understanding is that there is a way that because Hecate is willing to pay all of the network upgrade costs assigned to it, that there can be a solution where as part of the study, in other words, there's going to be a study that determines the allocation of network upgrade costs, right? That's what's being done in the transition cycle. And Hecate is saying we're willing to pay those. So there's... They've been assigned to it through what process? Well, right. So it's based on the assignment. My understanding is the initial assignment is being done as part of determining which projects get into the queue, right, or get into the new process. And so that's going to be an initial assignment of what... And that's how the commission says they're going to... Or PJM says they're going to determine whether something goes into the queue or into the transition cycle is whether you're assigned more than $5 million of network upgrade costs. And we're saying, you know, we heard from PJM, well, there are these projects with small network upgrade costs that, you know, let's say $1 million. And they say, oh, we like that. We want to stay in the expedited queue. We don't want to go try our luck over here. And our point is, yes, we've been assigned more than $5 million, but we also want to stay in the queue and we're willing to pay that. And so... But I'm just saying that when she described those who were in the serial processing, they did, in effect, a cluster study for all of them and did allocation. And you weren't part of that. No, I don't think that's what she said. I think the whole... And I'm sorry if I'm misstating. So the legacy process, which includes the expedited process, is a serial process. So in other words, based on the queue position, queue position one is studied. Then that's determined whether that can go to an interconnection agreement. Queue position two is studied. Queue position three is studied. The clusters only come in in the transition phase. And so our... And I think that's set out in the background sections of the brief. And our point is we want to go through that queue process. And whatever we're assigned, if it's $5 million, if it's $10 million, we're willing to pay that because we think... And we know the queue process is going to be faster because of the limited number and that it will get done before the transition cycle can complete. So we'll ask that the court vacate and remand. I can't let you go without asking you. Do you know how the name Hecate was... I mean, I looked it up. Maybe it's the goddess of darkness. I think it's interesting that an energy company... It's actually kind of whimsical. Yes. So the goddess of the crossroads is how we prefer to characterize that. I'm not sure of all of the details of its origin, but that is where we are. As a renewable company, we're looking to help the country steer on the crossroads towards greener energy and connect our process as quickly as we can to achieve that goal. Thank you. Thank you.
judges: Henderson; Pillard; Childs